UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 24-80041-CR-ROSENBERG(s)

UNITED STATES OF AMERICA

vs.

SAMANTHA HANA YI,

    Defendant.
_____/

# GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S OBJECTIONS AND SENTENCING RECOMMENDATION

The United States respectfully files this response in opposition to the defendant's objections to the presentence investigation report (PSI, DE 98) (DE 106). Pursuant to Title 18, United States Code, Section 3553(a), the United States recommends a sentence of twenty-seven (27) years' imprisonment.

**I.    THE PSI CORRECTLY APPLIES THE TWO-LEVEL ENHANCEMENT FOR MAINTAINING A PREMISES FOR MANUFACTURING OR DISTRIBUTING A CONTROLLED SUBSTANCE.**

This Court should overrule the defendant's objection to the PSI, arguing the two-level enhancement pursuant to U.S.S.G. § 2D1.1(b)(12) does not apply for maintaining a premises for the purpose of manufacturing or distributing a controlled substance (DE 106). Specifically, the defendant argues that the premises in question was owned by the co-defendant's mother, and that the defendant maintained a separate residence with her mother and children (DE 106, at 1). The defendant further argues that the defendant did not control access to or activities in the premises (DE 106, at 2).

Pursuant to U.S.S.G. § 2D1.1(b)(12), "[i]f the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance" a two-level enhancement applies. U.S.S.G. § 2D1.1(b)(12). The commentary states that—

> Among the factors the court should consider in determining whether the defendant "maintained" the premises are (A) whether the defendant held a possessory interest in (*e.g.*, owner or rented) the premises and (B) the extent to which the defendant controlled access to, or activities at, the premises.
>
> Manufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principle uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises. In making this determination, the court should consider how frequently the premises was used by the defendant for manufacturing or distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes.

U.S.S.G. § 2D1.1(b)(12), comment. (n. 17).

A possessory interest is only one factor that bears on the application of the enhancement. *United States v. Lockhart*, 732 F. App'x 842, 848 (11th Cir. 2018) (finding the court did not err in applying § 2D1.1(b)(12)'s two-level enhancement to a "crack house" where defendants asserted it was not their residence, because the "totality-of-the-circumstances" supported the enhancement, which included a defendant at the residence when the warrant was executed, and the defendants frequenting the apartment for the purpose of selling narcotics).

Here, the defendant admitted she had a possessory interest in the residence in her factual proffer, and even if she did not have a possessory interest, the totality of the circumstances indicates the enhancement applies. In the defendant's factual proffer, she admitted the residence was used to prepare and store drugs and that it was a joint residence. Specifically, the defendant admitted that

2

"[o]n March 6, 2024, law enforcement arrested Defendant and Mendez pursuant to federal arrest warrants and executed a search of their residence pursuant to a federal search warrant" (DE 72, at 13 ¶ 10). The defendant further admitted that "[t]his residence was determined to be used to prepare and store drugs for sale." *Id.* "The defendant's and Mendez's residence consisted of two floors. Defendant was on the first floor of the kitchen in front of the sink laying down. In the sink, a bag of white powder with a spoon was thrown down the garbage disposal. Beneath the large bag were numerous empty capsules used for packaging." *Id.* A revolver and fentanyl capsules were "within arms reach of Defendant when law enforcement entered the defendant's and Mendez's residence." *Id.* at 13-14, ¶ 11.

Although the defendant now argues she maintained a separate residence with her mother and children, on the contrary, the defendant's mother's mobile home is where her mother and children lived. The defendant lived at the joint residence with the co-defendant at "8610 Via Mar Rosso" (PSI, at 10 ¶ 33; DE 72, at 13-14). The mobile home is where her children and mother resided, but where the defendant chose to sell her drugs on numerous occasions. Specifically, the defendant brought the drugs stored and prepared from her joint residence with the co-defendant to the mobile home community where her children resided. Surveillance showed on numerous occasions that the defendant left her residence located at Via Mar Rosso and then sold the undercover officer fentanyl at the defendant's mother's mobile home community, or at various store locations (PSI ¶¶ 33, 35, 36, 38, 40, 42, 47, 56, 58, 61). "Surveillance units observed a black Dodge Challenger depart Yi and Mendez's residence . . . to the mobile home where the [undercover] was waiting" (PSI, at 10 ¶ 33) Further, on another occasion, "[s]urveillance units established themselves in and around the Via Mar Rosso residence and observed Mendez and Yi as they exited the residence and got into their Lexus

3

vehicle. Surveillance units followed the Lexus and observed it conduct two hand-to-hand narcotics distributions before meeting with the [undercover officer]" (PSI, at 11 ¶ 35). "Mendez and Yi drove away and were followed by surveillance units [to] Yi's mother's mobile home community . . . ." (PSI, at 11 ¶ 36).

Additionally, the defendant chose to bring drugs stored and prepared from her Via Mar Rosso residence for distribution at her mother's mobile home community even with children present outside. (PSI, at 11-12, ¶ 40 ("[S]urveillance units followed Yi . . . to her mother's Lantana mobile home community. . . Notably, [d]uring the transaction, there were two juveniles playing on their bicycles within feet of the Infiniti vehicle)).

Thus, this Court should apply the two-level enhancement pursuant to § 2D1.1(b)(12), because in addition to the defendant admitting that it was her and the co-defendant's residence and that the residence was used to prepare and store drugs, the totality of the circumstances indicate that the defendant frequently used her Via Mar Rosso residence for storing fentanyl and controlled access to, or activities at the premises.

## II. THE § 3553(a) FACTORS WARRANT A SENTENCE OF TWENTY-SEVEN YEARS' IMPRISONMENT.

The Sentencing Guidelines recommend a sentence of 324 to 405 months' imprisonment (PSI ¶ 133). A sentence at the low end of the Guidelines is twenty-seven (27) years' imprisonment. Pursuant to the § 3553(a) factors, the United States recommends a sentence of twenty-seven (27) years' imprisonment, based on the nature and circumstances of the instant offense, the history and characteristics of the defendant, the seriousness of the offense, and the need to promote respect for

4

the law, provide just punishment, afford adequate deterrence, and protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(1)-(2).

### A. The Nature and Circumstances of the Offense, and the Seriousness of the Offense, Warrant a Twenty-Seven Year Sentence.

In sentencing the defendant, this Court must consider, among other factors, the nature and circumstances of the offense, the seriousness of the offense, and the need to provide just punishment for it. 18 U.S.C § 3553(a)(1), (a)(2)(A).

The defendant sold fentanyl that resulted in the death of a ten-month-old baby girl. Motivated by greed, the defendant exploited a desperate, addicted mother. Neither the mother nor baby were strangers to the defendant. The defendant acted as the mother's friend, texted and called the mother, and sold fentanyl to the mother multiple times a week for years, all while the mother had the baby in her car seat. The defendant succeeded in getting repeat business from a soft target, who was trying to avoid painful drug withdrawals. The baby died as a result, but not even the death deterred the defendant from selling fentanyl. For years, the defendant continued making more money by selling fentanyl. As a result, the effects of fentanyl continued to ripple through communities because of the defendant's choice to continue to sell a lethal opioid.

On March 30, 2022, the baby's mother purchased fentanyl from the defendant (DE 72, Defendant's Factual Proffer, ¶ 6). When the baby's mother met with the defendant, the baby was in the car seat (*Id.* at ¶ 7). The next day, on March 31, 2022, the baby ingested the fentanyl sold by the defendant that resulted in her death. Due to the fentanyl intoxication, the Palm Beach County Medical Examiner's Office determined the baby's manner of death was a homicide (PSI ¶ 16). During the homicide investigation, law enforcement learned that the mother sent a video of the baby in distress

to the defendant on March 31, 2022, which is the same day the baby ingested fentanyl (DE 72, Factual Proffer, ¶ 4).  While driving, the mother took a video of the baby in her car seat. The video captured the baby with her head slumped forward, clearly in respiratory distress (PSI ¶ 19).  The mother also sent a text to the defendant with the video asking the defendant if she had "ever heard anything like this??!?!!??" (PSI ¶ 19). On that same day, texts and calls were made to the defendant from the mother, a return call and text was made to the mother from the defendant, and a text from the defendant stated: "Am here." (PSI ¶ 18). Thereafter, the mother went to the defendant's mother's mobile home park (PSI ¶ 19). Shortly after, the mother drove to Boynton Beach, where the mother ultimately called 911 (PSI ¶ 19). Palm Beach County Fire Rescue found the baby unresponsive and unconscious and transported the baby to the hospital (PSI ¶ 10). Due to no brain activity, on April 5, 2022, the baby was removed from life support and passed away (PSI ¶ 15).

Despite the video of the baby slumped forward in respiratory distress and the baby's death, the defendant continued to distribute fentanyl, totaling approximately 136 grams of fentanyl from December 2022 to December 2023 (DE 72, ¶¶ 9, 10). Notably, during the drug transactions, the defendant lived with the co-defendant at their Via Mar Rosso residence where the fentanyl was prepared and stored, but the defendant brought the dangers associated with drug distribution to the mobile home community where her children resided. The defendant conducted numerous fentanyl transactions outside the defendant's mother's mobile home, even when children were playing on their bicycles within feet of her vehicle (PSI ¶ 40). The defendant even knew the dangers associated with fentanyl, as she marketed the fentanyl as "fire caps," which indicates the fentanyl is powerful (PSI ¶ 51). The defendant further stated, "be careful" and "they're real strong" (PSI ¶ 52). Additionally, during another fentanyl transaction, the undercover officer observed children get out of

the defendant's vehicle while at the defendant's mother's mobile home (PSI ¶ 54). This transaction also included the defendant stating, "be careful with these," and "they're real strong" (PSI ¶ 54). Further, the defendant used a plastic wrap as a glove when she handed fentanyl to the undercover officer, stating it was "fire purple sh*t," and "its dropping people" (PSI ¶ 56). The fentanyl did "drop" people; a baby died.

Finally, the defendant chose to sell not only a highly lethal opioid with knowledge that it was dropping people, but she also chose to bring along her armed co-defendant to distribute fentanyl at a mobile home community—where her children resided. When law enforcement arrested the defendant, thirteen (13) firearms, fentanyl powder, and fentanyl capsules were found at her residence (DE 72, at 13 ¶ 10). Law enforcement also seized a cross-body bag containing a revolver that was observed being worn by the co-defendant during the drug transactions (DE 72, at 13 ¶ 11). In a post-*Miranda* interview, the defendant admitted that she and the co-defendant are drug dealers and are a package. *Id.* ¶ 13.

Thus, the seriousness of the offense, nature and circumstances of the offense, and the need to promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public from further crimes of the defendant warrant a sentence of twenty-seven (27) years' imprisonment. The defendant chose to profit from a mother of a baby, who struggled with an extremely addictive opioid, and then chose to continue selling fentanyl after the baby's death by bringing the lethal opioid and a gun to a community where her children lived, so she could continue to make money off America's fentanyl crisis.

### B. The Defendant's Criminal History Warrants a Twenty-Seven Year Sentence.

In sentencing the defendant, this Court must also consider, among other factors, the history and characteristics of the defendant. 18 U.S.C § 3553(a)(1), (a)(2).

In addition to the nature and circumstances of the offense, the defendant's criminal history establishes a complete disregard for the law. On June 29, 2023, the defendant was arrested for fleeing (PSI ¶ 102). The defendant was in a vehicle and stopped for a traffic violation, but when law enforcement approached the passenger side of the vehicle, the defendant fled. *Id.* The offense date occurred on April 20, 2023, but the defendant was not arrested until June 29, 2023. The defendant pleaded guilty to this offense on September 5, 2023. While on bond for the offense, on August 25, 2023, the defendant was arrested for grand theft (PSI ¶ 109). When she was arrested for grand theft, officers found drugs, which led to additional charges for possession of marijuana with intent to sell, possession of a hallucinogenic, possession of fentanyl, and possession of MDMA. *Id.* These charges remain pending and occurred not only while the defendant was on bond for fleeing and eluding but also when the defendant was selling fentanyl to law enforcement during the undercover homicide investigation in this case.

### C. The Defendant Has Already Received a Significant Benefit.

Finally, the defendant has already received a significant benefit by the government agreeing to seek dismissal of Count Nineteen (19) of the Superseding Indictment, charging the defendant with possession of a firearm in furtherance of a drug trafficking crime in violation of Title 18, United States Code, Section 924(c), after sentencing, despite the overwhelming evidence of the defendant possessing numerous firearms in furtherance of her drug trafficking at her residence.

WHEREFORE, the government respectfully opposes the defendant's objections to the PSI and recommends a sentence of twenty-seven years' imprisonment based on the § 3553(a) factors.

Respectfully Submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By: *s/ Shannon O'Shea Darsch*
Shannon O'Shea Darsch
Assistant U.S. Attorney
Florida Bar. No. 68566
Shannon.darsch@usdoj.gov
500 S. Australian Avenue, Suite 400
West Palm Beach, Florida 33401
TEL: (561) 209-1027
FAX: (561) 805-9846

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 18, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

*s/ Shannon O'Shea Darsch*
Shannon O'Shea Darsch (FL Bar No.  68566)
Assistant U.S. Attorney